Billings, A.J.
This case was filed in this Court, transferred (after proceedings described below) to the District Court pursuant to G.L.c. 231, §102C, tried there, and returns here pursuant to a retransfer. In its present posture, it presents an issue frequently confronted by lawyers in private practice (the plaintiffs’ personal injury bar in particular), but seldom litigated. It is this: When an attorney (Al) has put substantial work and expenses into a contingent fee matter and is then discharged, the client retains a second attorney (A2), and A2 thereafter settles the case and takes his contingent fee, can Al compel A2 to share the fee with him? More precisely: When, if ever, does Al’s indisputable entitlement to a recovery in quantum meruit for services rendered lie against A2, as opposed to the client?
In the circumstances of this case, detailed below, I hold that Al (plaintiff Malonis) may recover in quantum meruit against A2 (defendant Harrington), and therefore order that judgment enter for the plaintiff on Count II of the Complaint.
Findings of Fact
The parties have presented the case as a “case stated,” on a record consisting of the transcript and exhibits from the District Court trial and a Stipulation of Facts which restates, in condensed form, the evidence presented at that trial. I have taken the Stipulation as binding on both parties, and have reviewed and relied upon the transcript and the exhibits where necessary to supplement the Stipulation. I have also taken judicial notice of the docket in Loiselle v. BFI, Middlesex Superior Court no. 93-3723, where necessary.
The facts, largely but not wholly undisputed, are as follows. The plaintiff Malonis and the remaining defendant Harrington are both attorneys licensed to practice in Massachusetts. Their common client, Marc Loiselle, was injured in a motor vehicle accident on April 26, 1991, in which the operator of the other vehicle was employed by Browning-Ferris Industries, Inc. (“BFI”), a self-insurer. Loiselle retained Malonis as counsel within a few days of the accident, for a contingent fee of one-third the recovery. The record does not establish conclusively whether or not Malonis and *120 Loiselle had a written fee agreement, as required by Rule 1.5(c) of the Code of Professional Conduct, SJC Rule 3:01.[1] Malonis investigated the accident and secured payment to Loiselle, early on, of $6,780 in PIP benefits.
In early 1993, BFI offered $7,500 on the case. Loiselle rejected the offer, and Malonis prepared a demand under Chapter 93A, which he sent on May 12, 1993. On May 27, BFI offered $30,000, inclusive of PIP benefits already paid, which Loiselle again rejected. In June 1993, therefore, Malonis filed suit on Loiselle’s behalf in Middlesex Superior Court. Written discoveiy was exchanged, and Loiselle was deposed and underwent an independent medical examination.
Three years after the accident, Loiselle was still complaining of back pain. At Malonis’s suggestion, he underwent an MRI and an examination by a Dr. Pierce, an orthopedic surgeon at the Massachusetts General Hospital, in April 1994. Dr. Pierce recommended disc surgeiy. Malonis forwarded the surgeon’s report to BFI’s counsel, Paul Keane. BFI thereupon decided to increase its offer to $57,500. Keane did not, however, communicate this new position to Malonis. Malonis continued discussing with Keane a settlement in the range of $60,000 to $80,000, but no agreement was reached.
On September 14,1994 Loiselle discharged Malonis and engaged Harrington. Malonis forwarded his file to Harrington and on September 21, 1994, gave Loiselle, Harrington, and Keane written notice of an attorney’s lien on any recoveiy. Harrington wrote to Malonis on December 16, 1994, March 17, 1995, March 20, 1995 and March 27, 1995, each time asking him for a statement of his fees (the last letter requesting it no later than Friday, March 31). Loiselle chimed in on March 23, 1995, with a letter “instruct[ing]” Malonis “to submit a full and complete invoicing of your fees due you” on the case, and stating that “it would be appreciated” if this were provided to himself or to Harrington by March 30, 1995.
Harrington finalized a settlement with BFI at a mediation in early April 1995 for $57,500, the figure that BFI had determined to offer the preceding year but had not communicated to Malonis. This was paid in two checks dated April 4, 1995, one for $40,000 payable to Loiselle and his wife and the other for $17,500 payable to Harrington as attorney for Loiselle. This latter check, Harrington retained as his fee and expense reimbursement for Loiselle v. BFI. It represented a modest reduction from the one-third-plus-expenses specified in the fee agreement.
On that same day that the settlement checks were cut, Malonis finally provided the requested invoice to Harrington, setting forth an itemized breakdown of his hours and costs, and a claim for a fee of $10,320.00 and $1,035.80 in disbursements. Harrington viewed this claim as “ridiculous.”
BFI, Loiselle and Harrington consummated the settlement notwithstanding the fact that each had previously been notified of Malonis’s assertion of an attorney’s lien. BFI’s willingness to go forward was premised on an oral assurance by Harrington to Keane “that he [Harrington] would take care of Mr. Malonis.”[2]
Loiselle quickly developed second thoughts about the settlement, however, and filed (pro se) a motion to have it set aside. A hearing was scheduled for April 13, 1995 and rescheduled to April 21.
On April 10, Keane wrote to Harrington to say that BFI would be seeking costs if Loiselle pressed his motion, and adding, “As per our conversation today, you will resolve any issue regarding a referral fee owed to Attorney George Malonis.” So far as appears, Harrington did not reply to the letter. Keane reiterated this expectation two weeks later in a letter to Malonis, in which he stated that he had spoken with Harrington, “who has advised me that he will be in touch with you regarding the issue of your attorneys fee.”
On April 12, apparently as a consequence of Loiselle’s attempted repudiation of the settlement, Harrington moved to withdraw as his counsel. Also docketed that day was Loiselle’s “Motion to Determine the Existence and Validity of Attorney’s Lien.” It appears that a hearing was held on April 21, at which Loiselle withdrew his motion to set the settlement aside; an agreement for judgment was filed and approved; Harrington’s motion to withdraw was allowed; no action was taken on the motion regarding the attorney’s lien; and the case was closed.
Keane testified in the District Court that in his estimation, Malonis did about 80% and Harrington about 20% of the work on the case, an assessment that seems reasonable based on the record before me. The case was not extensively prepared by either counsel, but neither does it appear to have been underprepared for what it was: a motor vehicle case in which liability was essentially undisputed, and which involved moderate injuries. Malonis’s investigation included gathering records from the police and various medical providers; he met regularly with his client (whose office was in the same building as his); he filed the case; he conducted and defended such discoveiy as there was; and he negotiated with BFI, on the basis of which negotiations and the information Malonis provided BFI determined, before the case left Malonis’s practice, to offer the figure for which it ultimately settled.
While Harrington was critical in his District Court testimony of several aspects of Malonis’s representation (in part, passing along criticisms Loiselle made to him), Malonis offered reasonable explanations for each. The case was not filed until two and one-half years after the accident because Loiselle had not reached a medical end result (witness Dr. Pierce’s April 1994 recommendation for surgeiy). Malonis did not assert a consortium claim for Mrs. Loiselle, but explained that this was because the Loiselles were by *121 this time in divorce proceedings. It also appears that Malonis and his client had quite different views of the settlement value of the case, but that the settlement ultimately achieved essentially vindicated Malonis’s judgment in the matter.
Malonis has received nothing for his services and expenses in the Malonis v. BFI case. He retained counsel, who sent Harrington a demand for relief under G.L.c. 93A on June 15, 1995. Harrington responded on July 14, advising that “I will not tender one cent in ‘settlement’ to Mr. Malonis.”
On July 31, 1995, therefore, Malonis commenced this action, naming as defendants Loiselle, BFI, and Harrington, and seeking to recover $17,500 on various contract and tort theories and to enforce his attorney’s lien pursuant to G.L.c. 251, §50. Loiselle appeared pro se and filed an answer, the gist of which was that Malonis had ignored his requests to file his case promptly; that there was never a written fee agreement; and that Loiselle settled the case “with the knowledge and understanding that Attorney Harrington was to see to [Malonis] at no cost to [Loiselle] whatsoever; which he agreed to.”[3]
On December 3, 1997 this Court dismissed the counts asserting an attorney’s lien against BFI and Harrington, holding that caselaw under the lien statute “limits liens to situations where the litigation results in an official result favorable to the client and a settlement falls short of the requisite court order, judgment, or decree.”
With the lien claims out of the case and with damages claimed at only $17,500, the Court remanded the case to District Court, where Malonis’s claim against Harrington was tried on August 2, 2000.[4] On August 31, 2000 the District Court entered judgment for the defendant. This was affirmed by the Appellate Division on June 29, 2001. Malonis v. Browning-Ferris Industries, Inc., 2001 Mass.App.Div. 149 (2001). Final judgment entered in the District Court on July 12, and the plaintiff filed his request for retransfer on July 18, 2001. At a final pretrial conference on January 15, 2003 the parties submitted the case for decision on the record described above.
Discussion
1. Recovery in Quantum. Meruit Against Successor Counsel (Count II)
A client is free to discharge his attorney at any time, whether or not there is a contingent fee agreement. Salem Realty Co. v. Matera, 384 Mass. 803, 804 (1981), aff'g 10 Mass.App.Ct. 571 (1980). Normally, the discharge obviates any contract claim the lawyer might otherwise have to a contingent fee under his agreement with the client, but he may recover in quantum meruit the value of the services rendered. Salem Realty; Opert v. Mellios, 415 Mass. 634, 636 (1993) (both noting, but not deciding, the issue of whether an attorney discharged in bad faith might recover from his client on a contingent fee agreement); Craft v. Kane, 51 Mass.App.Ct. 648, 653 (2002).
Ordinarily, the discharged attorney’s quantum me-ruit claim lies against the client who retained and later discharged him. E.g., Salem Realty; Phelps Steel, Inc. v. Von Deak, 24 Mass.App.Ct. 592, 594 (1987). No Massachusetts appellate decision addresses whether, in any circumstances, the successor counsel may also (or instead) be liable directly to his predecessor. Since a contingent fee agreement makes client and counsel essentially equity partners in the outcome of the case, both are enriched by the efforts of predecessor counsel to the extent that these efforts materially contribute to the result. The issue is whether the enrichment is unjust, requiring restitution.
The Appellate Division’s thoughtful opinion in this case cites several cases from other jurisdictions, holding that the obligation to pay the discharged attorney belongs only to the client, not to successor counsel. They are: Adams v. Fisher, 390 So.2d 1248 (Fla.App. 1980); Hoddick, Reinwald, O’Connor & Marrack v. Lotsof, 6 Haw.App. 296, 719 P.2d 1107 (1986); and Styer v. Hugo, 422 Pa.Super. 262, 619 A.2d 347 (1993), aff'd., 535 Pa. 610, 637 A.2d 276 (1994). Each of these cases rejects, on disparate facts and for different reasons, the notion that a successor attorney should be responsible for the discharged attorney’s fee.
The Florida court in Adams was concerned that the client who discharges an attorney be held “responsible for his actions,” and noted also that a client could protect himself against being overcharged by expressly “contractfing] to pay second attorney a contingent fee less the fee due first attorney,” which the client in that case had not done. 390 So.2d at 1251.
In Hoddick et al„ the client discharged his fourth attorney and retained a fifth, at which time he agreed to pay the former 10% of any recovery plus expenses, and the latter, 50% of any recovery. After the case settled, Attorney No. 4 assigned his claim to the associate who had worked on the case, who then sought to recover the ten percent plus an additional hourly fee from No. 5. The court rejected the attempt, holding that where “the client knowingly and voluntarily agreed” to be responsible himself for paying No. 4, the agreement was the only basis for No. 4’s recovery. The court also made allowance for “the law of supply and demand,” plausibly concluding that as the fifth attorney in line, on a case that finally yielded a settlement of just $101,000 paid over five years, successor counsel was less interested in taking the case than the client was in retaining his services (hence, the 50% fee and the client’s undertaking to pay his former counsel’s fee himself). 6 Haw.App. at 302-03. All parties, therefore, were made to live by their agreements.
In Styer, the plaintiff attorney Styer was discharged and replaced by another attorney (Brill), who agreed *122 to share his fee with Slyer. Brill did little work on the case, felt the clients’ expectations were unrealistic, and ultimately suggested they find another lawyer. The clients retained a third attorney (Hugo), whereupon Brill wrote to the clients that he would not be seeking a fee. Brill did not inform Slyer of this, however, nor did he inform Hugo of his fee-sharing agreement with Slyer. Hugo later settled the case and took his one-third fee. The Pennsylvania court felt that “while Hugo realized some, albeit unquantifiable, benefit from the work that Styer performed, . . . [t]he record [did] not demonstrate that Hugo’s ultimate success in negotiating this settlement was materially advanced by Styer’s work.” In comparing the lawyers’ contributions to the settlement, the court concluded that Hugo’s retention of whatever benefit Siyler conferred “under the circumstances of this case was not unjust," and therefore rejected Styer’s quantum meruit claim against Hugo. 422 Pa.Super. at 270.
There is also contrary authority, permitting discharged counsel to assert a claim against successor counsel for a share of the fee.
In Pryor v. Merten, 127 N.C.App. 483, 486-87, 490 S.E.2d 590 (1997), the court permitted a recovery in quantum meruitby the discharged attorney against the second attorney. “To require [the discharged attorney] to proceed against [the clients],” the court felt, “would unfairly require [the clients] to pay attorneys fees in excess of the one-third contingency fee to which they agreed.” 127 N.C.App. at 487.
In Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 118-19 (La. 1979), the court held (on rehearing[5]) that “the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed” is to be divided between his lawyers, the apportionment to be based on the factors set forth in DR2-106 of the Code of Professional Responsibility as adopted by the Louisiana Supreme Court.[6] 373 So.2d at 118. The Louisiana court took a somewhat different path from that in the Pryor case (and the Massachusetts approach), holding that “the amount prescribed in the contingency fee contract, not quantum meruit, is the proper frame of reference for fixing compensation for the attorney prematurely discharged without cause.” Id.
Finally, a decision of this Court, Washburn v. McGuiness-Parlagreco, 1 Mass. L. Rptr. 85, 1993 WL 818918 (Mass.Super. 1993; Cowin, J.), denied a motion to dismiss a quantum meruit claim by discharged counsel against successor counsel, on the ground that the discharged attorney was “entitled to show that he is due reasonable fees for the work he performed prior to withdrawal,” and that successor counsel “may have been unjustly enriched to the extent that they were paid for work that included efforts by” former counsel.
In the case before me, I believe that Malonis, the discharged attorney, is entitled to assert his quantum meruit claim against Harrison, the successor attorney.
A quasi contract or a contract implied in law is an obligation created by law “for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent . . . [Considerations of equity and morality play a large part... in constructing a quasi-contract. . .’’It “is not really a contract, but a legal obligation closely akin to a duty to make restitution.” “A person who has been unjustly enriched at the expense of another is required to make restitution to the other.” The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust enrichment of one party and unjust detriment to the other party . . . “The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone’s reasonable expectations.”
Salamon v. Terra, 394 Mass. 857, 859 (1985) (citations omitted).
The record in this case includes statements by all affected parties — Malonis, Harrington, Loiselle, and even BFI’s counsel Keane — evidencing their shared expectation that Malonis’s fee and expenses would be covered by Harrington, out of his contingent fee. Their conduct, in settling the case and disbursing to Loiselle and Harrington in the face of Malonis’s assertion of an attorney’s lien, further evidences their assumption that Harrington would answer to Malonis. Without Harrington’s assurance to Keane on this point, it is clear that the funds would not have been disbursed.
The record further establishes that Malonis invested substantial time and funds into the case, and establishes with unusual clarity that his efforts materially contributed to the result — a $57,500 settlement which BFI had determined to offer even before the case was transferred to Harrington. Were Harrington to retain the entire contingent fee, he would be enriched at Malonis’s expense; such enrichment would be unjust by most people’s standards; and it would run counter to the reasonable expectations of all concerned.
Those expectations, one suspects, are typical of those held by attorneys and clients in many, perhaps most, contingent fee cases in which counsel is replaced after the case is substantially prepared. No client wants to pay twice. If the case is an attractive one, successor counsel is willing to commit to sharing his fee on some equitable basis with his predecessor; if he is not willing, the client may be able to find someone who is. Hopefully, successor counsel and client will have had a frank discussion on the matter and included their understanding — one way or the other — in their written fee agreement. See, e.g., Malone v. Harper, 11 Mass. L. Rptr. 522, 2000 WL 1180283 (Mass.Super. 2000; McHugh, J.) (“Although the lien claim is against plaintiff alone, the petitioning law firm and plaintiffs current counsel have agreed that the total fee she will pay to both of them will not exceed one-third of the total amount she recovered”); Hegarty *123 v. Commonwealth, 10 Mass. L. Rptr 614, 1999 WL 959807 (Mass.Super. 1999; van Gestel, J.) (similar); Buckelew v. Grossbard, 189 N.J. Super. 584, 585, 461 A.2d 590 (1983) (similar).
Doubtless, there are cases where attorney and client reach a contrary understanding. An example might be the eager client with a dubious case, which successor counsel may only be persuaded to accept on the clear understanding that the client’s obligation to former counsel is his alone, as in the Hawaii case (Hoddick et al) discussed above. It would also seem that in any case, even where successor counsel was sufficiently attracted to the case to assure the client that his legal fees (including the predecessor’s) would not exceed a specified percentage of the recovery, the client is still liable to former counsel, subject to any right he may have to indemnity by successor counsel. It was with the client, after all, that the former counsel contracted and for whom he performed services.
In this case, Malonis has chosen to waive his claim against Loiselle. The waiver honors the expectations of all involved, and there is no reason for the Court, any more than Malonis, to dishonor those expectations. As the Appeals Court noted in Salem Realty, the right of a client to change counsel “has not much value if the client is put at risk to pay the full contract price for services not rendered and to pay a second lawyer as well.” 10 Mass.App.Ct. at 575. Nor is it served by making the client solely responsible for a quantum meruit claim by the discharged attorney that successor counsel has expressly or impliedly agreed, as an inducement to the client’s retaining him, to absorb. I hold, therefore, that Malonis has a right to recover against Harrington in quantum meruit on Count II.
B.Waiver and Estoppel
Harrington contends, however, that by his tardiness in responding to Harrington’s and, ultimately, Loiselle’s requests that he submit an invoice, Malonis waived or is estopped from asserting his right to payment.
Waiver is the voluntary relinquishment of a known right. Merrimack Mut. Fire Ins. Co. v. Nonaka, 414 Mass. 187, 189 (1993); Restatement (Second) of Contracts, §84 comment b (1981). There is no indication in the record that Malonis ever voluntarily relinquished, or communicated an intention not to pursue, his right to a fee.
Nor does the record establish an estoppel. “The basis of an estoppel is a representation . . . intended to induce a course of action on the part of the person to whom the representation is made, and where, as a consequence, there is detriment to the person relying on the representation and taking the action.” Noble v. John Hancock Mut Life Ins. Co., 7 Mass.App.Ct. 97, 99 (1979), quoting from Capozzi’s Case, 4 Mass.App.Ct. 342, 347 (1976). “In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm . . .” DiMarzo v. American Mut. Ins. Co., 389 Mass. 85, 112 (1983). The burden of proving an estoppel is on the party asserting it. Clickner v. City of Lowell, 422 Mass. 539, 544 (1996).
Certainly, in a law practice or any other business, a request for an invoice is best obliged promptly. Malonis’s delay was doubtless aggravating to parties who were negotiating a settlement of the tort case, and understandably wished to know how the proceeds were to be divided. It may even have cost him the ability to negotiate the voluntary payment of a fee for his work on the case.
On the other hand, Harrington, Loiselle and BFI were on notice that Malonis had a claim and was asserting a lien on the settlement proceeds.[7] There is no indication in the record that the settlement would not have been consummated on the same terms had the amount of Malonis’s claim been known earlier, or that Harrington would have been able to secure a larger settlement from BFI, or that the $57,500 paid was not fair compensation for the claim — no evidence, in short, of detriment, even assuming that Malonis’s failure to communicate constituted the sort of representation or conduct needed to establish an estoppel. I hold that he is not estopped from pursuing his claim in quantum meruit
C.Amount of Quantum Meruit Recoveiy
There remains, then, the determination of what is a reasonable fee. In the circumstances of this case, the discharged attorney’s fee should be no more than the lesser of (a) a reasonable fee for the services rendered, based on the factors set out in Rule 1.5 of the Code of Professional Conduct (see footnote 7), and (b) a reasonable allocation of the contingent fee charged and collected by successor counsel, based on the respective efforts and contributions of the two attorneys.
Malonis’s invoice was reconstructed from his copy of the case file, “looking at my notes in the file, looking at the documents I prepared,” and not from contemporaneous time records (which he does not appear to have kept). This case, like the Salem Realty case, “suggests the utility of time records to a lawyer even when he does not expect time to be the basis for billing.” 10 Mass.App.Ct. at 577, n.5. Nonetheless, the invoice sets forth what appear to be conservative estimates of the time expended on various, individually enumerated tasks — -correspondence, telephone calls, preparation of pleadings and discoveiy requests and responses, and so forth, such as would be reflected in documents in a lawyer’s file.[8] The hourly rate ($150), hours expended (68.8), and overall fee ($10,320) all appear reasonable under the guidelines established by Rule 1.5 (omitting the final factor, “whether the fee is fixed or contingent”). The expenses of $1,035.80 are itemized and likewise appear reasonable.
*124 Not much appears in the record concerning Harrington’s contributions to the result. He did not conduct any discoveiy because the deadline for doing so had passed by the time he got the case. The docket reflects a conciliation on November 29, 1994, but no other court appearances between the time Harrington took the case and the time it settled. He represented Loiselle in negotiations and a mediation with BFI, which on the discussions which Malonis had begun and ultimately yielded the amount BFI had already decided to pay.
There is, in short, no reason to suppose that the estimate made by Keane of the relative effort expended — 80% by Malonis, 20% by Harrington — is unfair to Harrington, and I adopt it. Because the invoice prepared by Malonis is for an amount substantially less than 80% of the $17,500 fee, and because it is reasonable in amount, I award him the full $11,355.80 claimed.
D. Conversion and Chapter 93A Claims (Count III and V)
Malonis did not press his conversion claim at the District Court trial, and does not appear to press it here, so I consider it waived (and note as well that the damages on a conversion claim would duplicate those on the quantum meruit count in any event).
Malonis does urge a finding in his favor on the Chapter 93A count. The evidence does not, however, support such a finding. Harrington did not engage in any deception with respect to the settlement of the BFI case.[9] Nor was there such unfairness as to satisfy the familiar eyebrow-raising standard for dealings among sophisticated businessmen, which both parties in this case undoubtedly are. See Levings v. Forbes & Wallace, Inc., 8 Mass.App.Ct. 498, 503-04 (1979). There was considerable question, upon which reasonable legal minds could differ, concerning whether a discharged attorney’s quantum meruit claim will lie against successor counsel in these or any circumstances. Testing an unsettled rule of law, among lawyers, in a court of law, is not the sort of “unfair” conduct to which Chapter 93A is addressed.
ORDER FOR JUDGMENT
Judgment shall enter on Count II for the plaintiff against the defendant Harrington in the amount of $11,355.80. Judgment for the defendants, the plaintiff to take nothing, on the remaining counts.

 Malonis testified in the District Court that there had been a written agreement, but that he could not locate it, and surmised that it had been in his original file when he transferred it to Harrington. Harrington testified that Malonis had told him that he did not have a fee agreement with Loiselle for the BFI matter. The record does contain a written contingent fee agreement between Loiselle and Malonis with regard to Loiselle’s claim arising out of an earlier (November 21, 1990) accident, which Loiselle transferred to Harrington at the same time as the BFI case. Because Malonis, having been discharged before the BFI case was resolved, could not recover on the contingent fee agreement in any event, I need not, and do not, make any finding as to whether it was in writing or not.

 Keane testified to this statement: Harrington denied it. Assessing the credibility of a transcript can, of course, be a problematic business, but in this case, I have no difficulty crediting Keane’s recollection and discrediting Harrington’s. I doubt that BFI and Keane would have released the settlement funds, in the face of a notice of attorney’s lien, without at least this assurance from Harrington, and I note that when Keane memorialized it in a letter to Harrington, he was not disabused (see below).

 The counts were as follows:
I. Loiselle — breach of contract.
II. Harrington — unjust enrichment.
III. Harrington — conversion.
IV. Harrington — attorney’s lien.
V. Harrington — Chapter 93A.
VI. BFI — attorney's lien.
VIL BFI — Chapter 93A.

 Loiselle does not appear thereafter to have participated in the proceedings. The District Court trial was of Malonis’s claims against Harrington only, and counsel indicated in the Pretrial Conference in this Court on January 15, 2003 that the claim against Loiselle has been waived.

 Initially, a sharply divided court had held that the client who had terminated his attorney without cause was liable to pay the full contingent fee twice — once for the full percentage under the fee agreement with the first attorney, and again under the agreement with the second attorney. “No one,” the court admonished, “can be permitted to take advantage of his own wrong.” 373 So.2d at 106. The dissenters expressed their distaste for a rule which awarded two-thirds of an injured plaintiffs recovery to his lawyers, id. at 106-14, a sentiment that carried the day on rehearing.

 These are the familiar list that also appears in Rule 1.5 of the Code of Professional Conduct for Massachusetts (SJC Rule 3:07): the time, labor, and skill required; the novelty and difficulty of the questions involved; the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; the fee customarily charged in the locality for similar legal services; the amount involved and results obtained; the time limitations imposed by the client or by the circumstances; the nature and length of the professional relationship with the client; and the experience, reputation and ability of the lawyer or lawyers performing the services.

 I note, in passing, that the aforementioned December 3, 1997 order of the Court in this case, dismissing the attorney’s lien claims, has been called into question by the Appeals Court’s subsequent decision in Craft v. Kane, 51 Mass.App.Ct. 648, 651-52 (2002) (holding that attorney’s lien was not discharged by settlement and stipulation of dismissal of the underlying action). In any event, the possible existence of a valid attorney’s lien on the settlement proceeds was doubtless the reason for Keane’s care to obtain from Harrington the assurance that he would “resolve any issue regarding” Malonis’s fee.

 It is a truism in private law practice that time not recorded is time that will later be underreported. Malonis testified, plausibly, that he believed the invoice was “a conservative estimate of the time spent on the actual case.”

 There were some confusing communications (on both sides) with regard to the terms of settlement, and Malonis’s fee, with respect to the other claim Loiselle had, against Sentry Insurance Co. (transferred from Malonis to Harrington at the same time as the BFI matter). That case and fee were unrelated, however, to the matter before me.